UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**THOMAS SHIELDS,**

          **Plaintiff,**

   **vs.**            **8:08-CV-632 (NAM/DEP)**

**UNITED STATES OF AMERICA, Federal Bureau of Prisons,**

          **Defendant.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

THOMAS SHIELDS
FCI Butner II
P.O. Box 1500
Butner, North Carolina 27509
Plaintiff, *pro se*

HON. RICHARD S. HARTUNIAN
CHARLES E. ROBERTS, ESQ., Assistant United States Attorney
Office of the United States Attorney
100 South Clinton Street
Syracuse, New York 13261

**Norman A. Mordue, Chief U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

In this *pro se* action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671, *et seq.*, defendant moves (Dkt. No. 34) for summary judgment. Plaintiff, an inmate in federal custody, claims he was injured on September 4, 2007 in the recreation yard at Federal Correctional Institution at Ray Brook ("FCI Ray Brook") when bleachers on which he was seated tipped over backwards, causing him to land on his back and hit his head on the ground. Plaintiff alleges that the accident occurred due to defendant's negligence and that he received inadequate medical care for his injuries. As set forth below, the Court finds that defendant has established as

a matter of law that plaintiff was given proper medical treatment and that there is no causal connection between his fall from the bleachers and his medical condition. Plaintiff fails to raise a material question of fact; accordingly, the Court grants defendant's motion. In view of its decision, the Court does not reach the issues relating to defendant's alleged negligence in connection with the condition of the bleachers.

## APPLICABLE LAW

Summary judgment is appropriate only when there is no genuine issue with regard to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id.* If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id.* When deciding a summary judgment motion, a court must construe all the evidence in the light most favorable to the nonmoving party and draw all inferences and resolve all ambiguities in that party's favor. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005). Further, where the nonmovant is proceeding *pro se*, the court must read that party's papers liberally and interpret them "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks and citation omitted).

Plaintiff asserts negligence and medical malpractice claims under the FTCA, pursuant to

which the Government waived its sovereign immunity for a number of torts. 28 U.S.C. §§ 1346 and 2671, *et seq*. The FTCA grants district courts exclusive jurisdiction over civil actions for money damages for injury to person or property "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Liability under the FTCA is generally determined by state law; thus, New York law applies to this case. *See* 28 U.S.C. § 2674; *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). Under New York law, plaintiff must prove three elements to prevail on a negligence claim: the existence of a duty owed by defendant to plaintiff; a breach of this duty; and resulting injury to the plaintiff. *See Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000). If plaintiff's injury is *de minimis*, he is not entitled to compensation for pain and suffering. *See Homen v. United States*, 2002 WL 844347, *7 (S.D.N.Y. May 2, 2002); *Galaz v. Sobel & Kraus, Inc.*, 721 N.Y.S.2d 623, 624 (1st Dep't 2001). To establish a medical malpractice claim under New York law, plaintiff must establish that defendant breached the professional standard of care in the community and that such breach proximately caused his injuries. *See Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir.1994).

## DISCUSSION

With respect to his medical treatment, the pertinent part of plaintiff's complaint (Dkt. No. 1) claims as follows:[1]

> 9. That very soon after plaintiff and the other inmate came to rest on the

---

[1] Throughout this Memorandum-Decision and Order, the Court quotes directly from the record without noting or correcting errors in the original.

bleachers by sitting, the bleachers tipped over and they both fell.

10. That plaintiff landed hard on his back and also hit his head against the ground.

11. That plaintiff had great difficulty gathering himself and once gathered, he had to sit down on the collapsed bleachers to regain his sense of awareness, to wait for the pain and dizziness to pass, and to overcome the embarrassment he suffered.

12. That throughout the night plaintiff began to suffer unremitting headaches, unremitting burning sensations, lower back pains, dizziness, and discomfort.

13. That on September 5, 2007, the morning after the fall plaintiffs pain and discomfort worsened by radiating down plaintiffs left leg, plaintiffs back also stiffened.

14. That plaintiff reported his condition to staff member "lieutenant" Mr. Holder, a correctional officer. Plaintiff also reported to Mr. Holder how the bleachers collapsed causing his condition. Mr. Holder advised plaintiff to report to the medical department.

15. That immediately after talking to Mr. Holder plaintiff reported to the prisons medical department where he reported his condition to a medical technician named Mr. Orman. Without examining plaintiff and despite taking note of plaintiffs condition, "As plaintiff reported his injures, how he sustained them and that they were worsening", Mr. Orman told plaintiff to come back and sign up for sick call the next day.

16. That on the following morning, September 6, 2007, plaintiff again went to the prisons health services department as instructed by Mr. Orman. This time plaintiff consulted with a Miss Gore who was a nurse. Plaintiff again reported his fall, dizziness, tenderness and swelling near the lower spinal area of his back, and that presently his injuries were painful and discomforting.

17. That without even performing a cursory exam nurse Gore stated to plaintiff with ridicule and derision, "There's nothing wrong with you, the best I can do for you is prescribe some Motrin". Plaintiff was prescribed Motrin and placed on convalescence (bed rest) for two weeks. However, neither convalescence nor Motrin relieved plaintiffs pain and suffering.

18. That later in the day on September 6, 2007, plaintiff advised lieutenant Holder that he was still dizzy, that he was still in pain, uncomfortable, had stiffness in lower back, and was still suffering an unremitting burning sensation from his lower back down his legs. Plaintiff was escorted to the prisons medical department where again he conferred with Mr. Orman about his condition. Plaintiff reported significant unremitting pain, stiffness, headache, dizziness, burning sensation and other discomforts.

19. That Orman had Plaintiff remove his shirt and when he examined plaintiffs back he determined that there was signs of trauma in the area complained of. However, this concluded the examination, Mr. Orman did

-4-

>  not order the medically appropriate appointment with a doctor, he advised plaintiff to continue taking the Motrin and to do stretch exercises. When plaintiff advised Mr. Orman that the Motrin did not help he ignored plaintiff, when plaintiff advised Mr. Orman that the condition would not allow him to do stretch exercises or any type of exercise Mr. Orman again ignored plaintiff.
> 20. That plaintiff continued to report his condition by repeatedly reporting it to the prisons medical staff and was repeatedly given cursory examinations by various FCI Ray Brook medical staff which did not relieve the pain and undue suffering described herein.
> 21. That plaintiff was left to suffer for an extended period of time with the injuries he sustained as a result of sitting on hazardous bleachers. Plaintiff continues to suffer complications from the fall he took when the bleachers collapsed and will require additional specialist care and diagnostic testing to determine the extent of his injuries. Currently plaintiff has to use a cane and other support aids to walk and stand. Plaintiff cannot stand, sit, or lay on his back for a moderate amount of time without significant discomfort and pain.
> 22. As a direct result of the bleachers collapsing when plaintiff sat on them and the fact that such dangerous conditions were permitted to exist at FCI Ray Brook, plaintiff sustained personal injuries, many of which are believed to be permanent in nature, including chronic pain, headaches, dizziness, burning sensation, stiffness, swelling in lower back, nerve damage and other neurological injuries unknown at this time.
> 23. As a result of the dangerous bleachers that were permitted to exist at FCI Ray Brook and the lack of prompt medical care, plaintiff has been placed at an increased risk of developing future health problems, including, but not limited to, nerve damage, neuralgia, cerebral hemispheric abnormalities in the head, permanent numbness in lower back and legs, spinal disc protrusion, spinal canal stenosis, bilateral neuroforaminal stenosis, disc desiccation, loss of disc space, hypertrophic changes, and generalized posterior disc bulge as well as other back and head injuries unknown at this time.

In support of its contention on this motion that plaintiff cannot prove negligent medical treatment or medical malpractice, defendant relies primarily on the declaration of Dawn Marini, M.D., Clinical Director of the Health Unit at FCI Ray Brook. Dr. Marini states:

> 1. I am the Clinical Director of the Health Unit at FCI Ray Brook. As a medical doctor I provide medical care and treatment directly to inmates. I also supervise the medical clinic, which has both permanent and contract employees, including physicians (dentists, orthopedist, psychiatrist),

-5-

physicians assistants, nurse practitioner, paramedic, EMT-CC, nurses, and other technicians. I am responsible for the medical care of approximately 1,300 inmates.

2. I understand that inmate Thomas Shields has commenced a civil action in which he alleges that he fell off a set of bleachers at FCI Ray Brook; and the fall caused him to suffer serious and debilitating injuries, including dizziness and extreme pain. I understand that Mr. Shields alleges that after the fall, he received improper medical treatment from the clinical medical staff, including improper diagnosis and treatment of his injuries.

3. I am familiar with the medical treatment which was provided to Mr, Shields while he was an inmate at FCI Ray Brook. I provided medical treatment directly to him. I also oversaw the treatment which was provided to him by the medical staff. I have also reviewed his medical records, regarding his treatment at FCI Ray Brook, FMC Butner (a Federal Medical Center, or hospital for inmates), and other facilities. This affidavit will address Mr. Shields' claims that: 1) the fall caused him to suffer serious and permanent injuries, and 2) that he received improper diagnosis and treatment of his injuries from the clinical medical staff.

4. Based upon my personal familiarity with Mr. Shields' treatment, and my review of the medical records, I am aware of no medical evidence that his fall from the bleachers caused him to suffer any serious injuries. The records show that on September 6, 2007, he reported that the bleachers had fallen on him two days earlier. He reported low back pain at a level of 7/10. Physical examination showed no tenderness around the spine, no tenderness around the kidney, no swelling, no bruising or red marks, and that Mr. Shields was able to stand up straight and touch his toes without pain. He was given "minor first aid" and directed to rest, treat the pain with ice and ibuprofen, and to convalesce for two weeks. X-rays were also done.

5. Five days later, on September 11, 2007, he was seen at the medical clinic twice, for complaints of back pain. The first visit, at 12:40 PM, shows a pain level of 3/10, no bruising or red marks, no tenderness around the kidney, and a "diffuse tenderness" over his right lower back. He was directed to take hot showers and continue ibuprofen. At 11:00 PM on September 11, he was seen again: "Pt. Walked onto HSU under staff escort demanding that a more thorough exam be done on his back. A visual inspection of his back was made. <u>Very</u> minor, diffuse swelling observed in the mid lumbar region. No other marks or abnormalities observed." [emphasis in original].

6. I directed that multiple x-rays be taken of Mr. Shields' back and surrounding area. X-rays of the lumbosacral (lower back) area, left hip, right hip, and pelvis were taken and were read by a board-certified radiologist. The x-rays showed no fractures of any sort. The x-rays did show that Mr. Shields had degenerative disc disease. Degenerative disc disease is a progressive worsening of the condition of the discs in the spine,

occurring over a period of years.

7. The medical records also show that Mr. Shields was suffering from degenerative lumbar spondylosis at the time of the fall. This is a deterioration of the vertebrae in the spine. In other words, at the time of this accident, Mr. Shields was suffering from progressive deterioration of the discs and vertebrae in his spine. These diseases originate within the body itself, and are not caused by trauma such as a fall. These diseases can cause pain in the back and surrounding area.

8. The medical records also show several other preexisting conditions, including a history of three gunshot wounds (left side of head, left foot, right shoulder); three abnormal images of the brain (two abnormal MRIs and one abnormal CAT scan, consistent with multiple sclerosis); hypertension; upper gastrointestinal bleeding; and a history of dizziness and vertigo (in 1997, he reported vertigo for a period of three months, and he also reported a history of dizziness). The records show that Mr. Shields reported he was treated twice for syphilis. His complaints of dizziness and vertigo may be consistent with neurosyphilis, or syphilis of the brain.

9. Based upon his overall medical condition and medical history, I ordered Mr. Shields transferred to FMC Butner, for further assessment and treatment. The primary reason for the transfer was for neurological evaluation. FMC Butner is a large hospital in Butner, North Carolina, maintained by the Federal Bureau of Prisons specifically for inmates, with extensive facilities and a large staff of specialists and other medical personnel. The medical records show that at FMC Butner, Mr. Shields was given multiple x-rays of his brain, back and other parts of his body. Those x-rays showed he had multiple lesions on the brain, possibly related to Mr. Shields' poly-substance abuse. There is no medical evidence this was related to the fall from the bleachers. He also had "mild spinal canal stenosis," a mild shrinking and narrowing of the spinal column. There is no medical evidence that this was related to the fall. He also had multiple consultations with various specialists and medical staff. The medical records show that Mr. Shields repeatedly claimed that he had back pain which was caused by the fall from the bleachers at FCI Ray Brook. However, the medical records contain no entry or opinion by any physician which supports that claim.

10. The medical records also show that on three occasions Mr. Shields refused to allow diagnostic procedures and treatment to be performed. He refused to allow contrast on a brain MRI on May 8, 2008; he refused to have a neurological consult on July 30, 2009; and he refused treatment with interferon for presumptive multiple sclerosis. These refusals are significant because I transferred him to FMC Butner for further assessment and treatment, and when a patient refuses to cooperate in necessary testing, he prevents the medical specialists (physicians) (in this case, FMC Butner) from fully assessing the nature of the problem.

11. I have also reviewed a declaration by Robert Walasin, M.D., and its attached medical records, regarding Mr. Shields' medical treatment at FMC Butner. Dr. Walasin avers that Mr. Shields repeatedly complained to FMC Butner of low back pain which he claimed was caused by the fall from the bleachers. Dr. Walasin avers that he saw Mr. Shields on three separate occasions walking and moving in a manner which was inconsistent with his complaints of low back pain. He saw Mr Shields "ambulating very briskly along sidewalk, pushing (not leaning on) his walker"; and on a second occasion, he saw Mr. Shields walking to the dining room and "Again, he walked very briskly (close to a jogger's pace), pushing his walker before him, not leaning on it or using it for support." On a third occasion, Dr. Walasin observed Mr. Shields "pushing his wheeled walker in front of him, not using it at all." Dr. Walasin avers that after he "observed Mr. Shields walking and moving without difficulty on three separate occasions," he reviewed Mr, Shields' "medical records and multiple MRI scans to further assess the nature and severity of his low back problem. Those records showed that he had only mild degenerative joint disease and mild closing of the spinal column, two mild organic problems with the back, with no evidence of any more serious injury or disease." Dr. Walasin concluded that these "mild" conditions were "not enough to warrant walkers, canes, bottom bunk, P.T., etc.", therefore he discontinued them. Dr. Walasin avers that his observations are not consistent with Mr. Shields' claims that he has to use walkers and other aids, or his claims that he "cannot stand, sit, or lay on his back for a moderate amount of time without significant discomfort and pain."

12. Dr. Walasin's declaration and medical notes are significant for several reasons: they are more recent than the treatment provided to Mr. Shields at FCI Ray Brook, they are based upon further testing and consultations, and they are based upon the personal observations and familiarity with the record of a treating physician. As noted by Dr. Walasin, low back pain is difficult for a health care provider to verify or quantify, malingering is common in prisons, and external observations, such as watching a patient walk or run without difficulty are an "important indicator of the true severity of a condition."

13. I understand that Mr. Shields alleges that as a "direct result" of the bleachers "collapsing," he has sustained "personal injuries, many of which are believed to be permanent in nature, including chronic pain, headaches, dizziness, burning sensation, stiffness, swelling in lower back, nerve damage and other neurological injuries unknown at this time." Based upon my personal treatment of Mr. Shields, and my review of the medical records, I am aware of no medical evidence to support this allegation. The medical records show a history or dizziness and vertigo beginning in 1997, 10 years before the reported fall.

14. Also, as discussed previously, the records show that on September 6,

2007, Mr. Shields reported to medical staff that the bleachers had fallen on him two days before. There is no medical record of Mr. Shields reporting an injury earlier. Physical examination revealed no tenderness around the spine, no tenderness around the kidney, no swelling, no bruising or red marks, and be was able to stand up straight and touch his toes without pain. He was given ibuprofen and told to treat the pain with ice. He was treated twice on September 11, 2007, seven days after he reported he fell, and once again the record shows no bruising or red marks, and no tenderness around the kidney. The only injuries recorded are a "diffuse tenderness over the right lower back," and "Very minor, diffuse swelling observed in the mid lumbar region. No other marks or abnormalities observed." (Underlining in original medical record).

15. The "very minor" swelling and tenderness observed by staff one week, after the reported fall is consistent with injuries that can be caused by a fall from a low height. However, small minor swelling and tenderness in the back can also be caused by many other factors including exercise, sleeping in a bad position, tripping, and accidents unrelated to the fall. I cannot state to a reasonable degree of medical certainty what was the cause of the "very minor" swelling and tenderness observed by the medical staff one week after Mr. Shields reported he fell from the bleachers.

16. A soft tissue injury from a fall may cause tenderness, swelling, and bruising, and these may appear several days after the injury - but they commonly appear in the first 48 hours. It is significant that two days after the reported fall, on September 6, 2007, medical staff observed "*no* spinal tenderness, *no* swelling, *no* ecchymosis [red marks and bruising], *no* CVAT [costo-vertebral angle tenderness] [kidney area tenderness]", and Mr. Shields was able to touch his toes without difficulty. (Emphasis added).

17. Finally, I understand that Mr. Shields alleges he received improper medical treatment at FCI Ray Brook. He alleges the Ray Brook medical staff gave him only "cursory" examinations which did not relieve his pain and suffering and he "was left to suffer for an extended period of time with the injuries he sustained as a result of sitting on hazardous bleachers."  As discussed previously, the medical records show that two days after the reported fall, examination disclosed no injuries, and seven days after the fall examination disclosed only "very minor" swelling and tenderness. Perhaps most significantly, multiple x-rays taken approximately one month later were all negative for acute (new) injury and disclosed no fractures. Based upon my experience and training, the treatment provided to Mr. Shields, and in particular the multiple x-rays of the area surrounding his lower back and pelvis, exceeded the level of treatment which typically would be provided to a non-inmate after a fall from a low height, with either no or "very minor" observable injuries.

18. I also understand that Mr. Shields alleges he "continues to suffer

-9-

>complications from the fall he took when the bleachers collapsed and will require additional specialist care and diagnostic testing to determine the extent of his injuries. Currently plaintiff has to use a cane and other support aids to walk and stand. Plaintiff cannot stand, sit, or lay on his back for a moderate amount of time without significant discomfort and pain." Based upon my personal treatment of Mr. Shields and my review of the medical records, there is no medical evidence to support this allegation. This allegation has been addressed at length by Dr. Walasin in his declaration, which is based upon more recent testing and observations.
>\*\*\*
>20. In conclusion, I am aware of no medical evidence to support Mr. Shields' allegations that he received improper medical treatment, or that a fall from the bleachers at FCI Ray Brook caused him serious and continuing injuries.

(Citations to record omitted.) Attached to Dr. Marini's declaration are the medical records upon which she relies. These records, which are selected from the voluminous medical records submitted to the Court, fully support her declaration. Defendant also submits Dr. Walasin's declaration and supporting medical records; these are consistent with and support Dr. Marini's declaration. Further, defendant submits a declaration from Max Thwaits, Facility Manager at Ray Brook, concerning the condition of the bleachers; Thwaits states that the top row of the four-row set of bleachers on which plaintiff was seated was 2.6 feet high.

The declarations from Drs. Marini and Walasin and the medical records submitted to the Court establish that defendant has carried its initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. By competent medical evidence defendant establishes that plaintiff sustained no more than negligible injuries from his fall; that there was no undue delay or failure to evaluate, diagnose, or treat him in connection with the fall or in any other respect; that he was appropriately treated for his complaints; and that his ongoing medical issues stem from medical conditions unrelated to the fall. Defendant's submissions demonstrate that there has been no breach of its duty to plaintiff

-10-

such as would support a negligence claim in connection with his medical care, that there has been no breach of the professional standard of care such as would support a medical malpractice claim, and that the medical conditions of which plaintiff complains were not caused or aggravated by any negligence or malpractice in connection with his medical care.  Further, defendant's submissions demonstrate that there is no causal connection between plaintiff's fall from the bleachers and his medical condition.

In considering whether plaintiff has responded with evidence establishing the existence of a disputed issue of material fact requiring a trial, the Court reviews all of plaintiff's submissions, including his complaint (quoted above), his deposition testimony, and his response to the summary judgment motion.  His opposition to this motion includes the following:

> Throughout the night [after he fell from the bleachers] plaintiff suffered unremitting burning sensations down his lower back and legs, back pains, dizziness, and discomfort.  On September 5, 2007, plaintiff's discomforts worsened, as a result plaintiff reported his condition to staff member Lieutenant Holder, Mr. Holder advised plaintiff to report to the medical department.  Once Plaintiff arrived at the medical department he consulted with medical staff member, Mr. Orman. Without examining plaintiff Mr. Orman advised plaintiff to come back and sign up for sick call "tomorrow"; the next day. The following day plaintiff consulted with a medical staff member named Miss Gore, and after plaintiff reported his condition, his injuries, and how he sustained them, Miss Gore stated to plaintiff, "there's nothing wrong with you the best I can do is give you some Motrin". Plaintiff was prescribed Motrin and placed on bed rest (a/k/a convalescence), Plaintiff was not appropriately examined and a cursory exam was not even performed. Plaintiff's pain and suffering were not relieved.
>
> Later that same day plaintiff reported to another staff member and advised the staff member that he was dizzy, feeling very uncomfortable, with unremitting pain, headaches, and burning sensation from his lower back down his legs. Plaintiff was escorted back to the prison's medical department where he was examined by Mr. Orman. Mr. Orman visually examined plaintiff and determined that there were signs of trauma in the area complained of. See complaint. Mr. Orman did not order the medically

-11-

>   appropriate appointments with medical doctors, he advised plaintiff to exercise ("contrary to medical wisdom"), continue taking Motrin, and rest.
>
>   Plaintiff continued to report his condition to various F.C.I. Ray Brook staff, each time plaintiff reported his condition to medical staff he was repeatedly given cursory examinations by various medical staff. Plaintiff was continually instructed to take Motrin or other Nsaids despite advising staff that such treatments did not relieve the pain and undue suffering described in the complaint. Plaintiff was left to suffer for an extended period of time with the injuries he sustained as a result of falling on the hazardous bleachers.
>
>   Plaintiff continues to suffer complications from the fall he took when the bleachers collapsed and will require specialist care and other support aids to walk and stand. Currently plaintiff has to use a cane and a walker. Plaintiff cannot stand, sit, or lay on his back for a moderate amount of time without significant discomfort and pain.

Accepted as true and viewed in the light most favorable to plaintiff, his allegations of pain and disability do not create a question of fact on whether defendant breached its duty to him in connection with his medical care or failed to meet the professional standard of medical care. Plaintiff's opinions that he should have been examined more thoroughly and given stronger pain medication do not raise a question of fact on this record.  He submits nothing that casts doubt on the propriety of defendant's evaluation, diagnosis, or treatment of his complaints.  Further, plaintiff raises no question of fact on whether the medical conditions of which he complains were caused or aggravated by any negligence or malpractice in connection with his medical care.  Nor, on this record, does plaintiff create a question of fact on whether he was significantly injured in the fall or whether his medical condition was caused or aggravated by the fall.[2]

Viewing the entire record in the light most favorable to plaintiff, and affording him every

---

[2] In reviewing the entire record, particularly plaintiff's extensive medical history, the Court finds nothing to suggest a need to appoint a medical expert.

-12-

lenience as a *pro se* plaintiff, the Court holds that defendant has established as a matter of law that it breached no duty to plaintiff in connection with his medical care; that it met the applicable professional standard of medical care; and that plaintiff's medical condition was not caused or aggravated by any negligence or malpractice in connection with his medical care. Defendant has further established as a matter of law that any injury plaintiff sustained from the fall was negligible, and that the medical conditions of which plaintiff complains were not caused or aggravated by the fall. There is therefore no need to address whether plaintiff's fall itself resulted from any actionable negligence on the part of defendant. On this record, there is no basis upon which plaintiff may recover against defendant under the FTCA. Accordingly, defendant is entitled to summary judgment dismissing the action on the merits.

## CONCLUSION

It is therefore

ORDERED that defendant's motion (Dkt. No. 34) for summary judgment is granted; and it is further

ORDERED that the action is dismissed in its entirety on the merits.

IT IS SO ORDERED.

Date:   July 15, 2010
        Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge